Gianni F. ARMANI, Plaintiff,

v.

**MAXIM HEALTHCARE SERVICES,
INC., a Maryland corporation,
Defendant.**

No. Civ.A. 98–B–480.

United States District Court,
D. Colorado.

June 30, 1999.

Donald A. Degnan, Jude A. Biggs, Holland & Hart LLP, Boulder, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendant, Maxim Healthcare Services, Inc. ("Maxim"), moves for summary judg-

ment pursuant to Rule 56. Plaintiff, Gianni F. Armani, opposes the motion. The motion is adequately briefed and oral argument would not materially aid its resolution. For the reasons set forth below, I grant summary judgment on Mr. Armani's claims for overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 203 ("FLSA"), promissory estoppel, failure to pay unpaid wages under Colorado's Wage Claim Act, C.R.S. § 8–4–104, and constructive discharge/wrongful discharge. I deny summary judgment on Mr. Armani's claim of fraud.

Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1331, original federal question jurisdiction, over Plaintiff's claims under the FLSA. Supplemental jurisdiction exists over Mr. Armani's remaining state law claims pursuant to 28 U.S.C. § 1367(a). Jurisdiction is also proper under 28 U.S.C. § 1332(a), diversity jurisdiction, as Plaintiff is a citizen of Colorado and Defendant is incorporated in Maryland and has its principal place of business in Maryland. The matter in controversy exceeds the sum of $75,000.

## I.

The following undisputed facts are relevant to my determination of Maxim's motion for summary judgment. Since 1989, Mr. Armani has been a certified nursing assistant ("CNA"), licensed by the State of Colorado. Before his employment with Maxim, Mr. Armani was employed by Craig Rehabilitation Hospital where he worked with quadriplegic patients.

Maxim provides nursing care and related health services to injured, disabled, and other persons in need of such care. Maxim employs registered nurses ("RNs"), licensed practical nurses ("LPNs"), CNAs, personal care providers ("PCPs"), and homemakers. These individuals work in private or public institutions, or in private homes.

Mr. Armani was a full-time Maxim employee from October, 1991, to November, 1997. During his employment, Mr. Armani was primarily assigned to provide in-home CNA services to a quadriplegic patient. Mr. Armani provided the patient with many services including catheter maintenance, bowel programs, giving of medication, exercising, bathing, grooming, feeding, dressing, running errands, and transportation.

When Mr. Armani first began working for Maxim he was paid $12 per hour. This amount was above the standard $9 hourly rate for CNAs employed by Maxim. Mr. Armani estimates that he was working between 50 and 60 hours per week caring for the patient. Maxim does not dispute that Mr. Armani worked in excess of 40 hours per week. Towards the end of his employment with Maxim, Mr. Armani was earning $14 per hour. In October, 1997, Maxim informed Mr. Armani that his pay rate would be reduced from $14 to $9 per hour. Mr. Armani then submitted a letter of resignation.

Mr. Armani was not paid overtime compensation of one and one-half times his regular hourly wage for hours worked in excess of forty hours per week. He alleges that under the FLSA he was entitled to this overtime compensation. He also alleges that upon his complaints, Maxim made numerous promises to him regarding its intent to pay overtime compensation. On October 15, 1997, Mr. Armani's attorney mailed a demand letter to Maxim demanding payment of past earned and unpaid overtime hours. Ten days later Mr. Armani's pay was reduced. Upon notice of the reduction, he resigned from his employment with Maxim.

After Mr. Armani filed suit in Colorado State District Court, Maxim removed this action to this court. Mr. Armani brings the following claims for relief against Maxim:

(1) failure to pay overtime under the Fair Labor Standards Act;

(2) promissory estoppel;

(3) failure to pay unpaid wages under Colorado's Wage Claim Act;

(4) fraud; and

(5) constructive discharge/wrongful discharge.

## II.

The purpose of a summary judgment motion is to assess whether trial is necessary. *See White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). Rule 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The non-moving party has the burden of showing that issues of undetermined material fact exist. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. Rule 56(e); *see also Otteson v. United States,* 622 F.2d 516, 519 (10th Cir.1980). These facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Mares,* 971 F.2d at 494. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *see White* at 360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *See Anderson,* 477 U.S. at 247–248, 106 S.Ct. 2505.

## III.

Mr. Armani's first claim for relief is for unpaid overtime compensation under the FLSA. Maxim moves for summary judgment on this claim arguing that Mr. Armani, as a CNA, falls within the "companionship services exemption" to overtime requirements. 29 U.S.C. § 213(a)(15). Mr. Armani argues that he fits the "trained personnel" exception to the cited exemption. Maxim does not dispute that Mr. Armani worked more than forty hours per week and did not receive overtime compensation. Rather, Maxim's sole contention is that Mr. Armani's services are exempt from FLSA coverage.

■ The purpose of the FLSA is to ensure minimum wages and working conditions to workers in industries throughout the states. *See Bayles v. American Medical Response of Colorado, Inc.,* 937 F.Supp. 1477, 1482 (D.Colo.1996). Generally, the FLSA requires that an employee be compensated at a rate of one and one-half times his regular pay for hours in

excess of forty in a single work week. 29 U.S.C. § 207(a)(1). Section 213 of the FLSA exempts certain jobs from this overtime pay requirement.

Maxim argues that Mr. Armani fits into the "companionship services exemption" of § 213(a)(15) and is not entitled to overtime pay. The FLSA expressly excludes from coverage,

> any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary).

29 U.S.C. § 213(a)(15). The regulations further define "companionship services" as:

> [T]hose services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: Provided, however, That such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked. The term "companionship services" does not include services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse. . . .

29 C.F.R. § 552.6 (1998).

The employer bears the burden of establishing an exemption under the FLSA. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 197, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). "These exemptions are to be narrowly construed against the employers seeking to assert them and their application is limited to those establishments plainly and unmistakenly within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). In the absence of disputed material facts the question is one of law. *See, e.g., Bayles,* 937 F.Supp. at 1482.

As a CNA at Maxim, Mr. Armani was able to dispense medications, change and clean catheters, perform range of motion exercises on the patient, bathe, groom and dress the patient, perform bowel programs, cook for and feed the patient, care for wounds, transport the patient to and from work, clean the patient's house, run errands for the patient, and help with finances. (Armani Deposition, pp. 49–76). While performing these duties, Mr. Armani was under the direct supervision of a Registered Nurse.

Maxim argues that Mr. Armani falls within the statutory and regulatory definitions of exempt employees performing "companionship services." (Maxim's Summary Judgment Brief, p. 6). Mr. Armani, however, relies on the regulatory exception to this exemption which states, "[t]he term 'companionship services' does not include services relating to the care and protection of the aged or infirm which require and are performed by *trained personnel,* such as a registered or practical nurse." 29 C.F.R. § 552.6 (emphasis added). Mr. Armani concedes that he is not a registered or practical nurse but argues that these are merely examples given in the regulation and should not constitute the limited class of people included in "trained personnel." (Opposition, ¶ 28).

The Tenth Circuit has not yet addressed the issue whether a nursing aid, such as Mr. Armani, fits within the companionship services exemption to overtime requirements under the FLSA. However, three other circuits have addressed this issue. *See Salyer v. Ohio Bureau of Workers' Compensation,* 83 F.3d 784 (6th Cir.1996); *Cox v. Acme Health Services, Inc.,* 55 F.3d

1304 (7th Cir.1995); *McCune v. Oregon Senior Services Div.*, 894 F.2d 1107 (9th Cir.1990).

■ Reviewing Mr. Armani's duties in relation to the definition of "companion services," I conclude that they fall within the definition. *See Salyer*, 83 F.3d at 787 (woman who gave medication and helped disabled dress, bathe, ambulate, and clean provided "companionship services" under FLSA); *Cox*, 55 F.3d at 1306 (CNA who performed therapy and nursing services, personal care, ambulation, exercise, household services, and medication assistance held to perform "companionship services" under FLSA); *McCune*, 894 F.2d at 1111 (CNAs who performed cleaning, cooking, hygiene and medical care held to perform "companionship services" under FLSA).

Mr. Armani was certified as a CNA in 1989 after learning the skills required to pass the CNA exam from "on-the-job training" at a nursing home. (Armani Deposition, pp. 13–15). Since becoming a CNA, Mr. Armani has taken twelve hours of continuing education per year in order to maintain his certification. (Armani Affidavit, ¶ 6). Before employment with Maxim, Mr. Armani worked with quadriplegic patients at Craig Hospital. (Armani Affidavit, ¶ 3). Mr. Armani has never taken an approved CNA certification class. (Armani Deposition, pp. 25–27). If Mr. Armani had taken such a class instead of receiving approved "on-the-job training," Colorado requires 75 hours of formal training, 16 of which must be in the classroom. Colorado Rules and Regulations for Approval of Nurse Aide Training Program, § 5.3 (authorized by C.R.S. § 12–38.1–103(3)).

In contrast, in Colorado, a Registered Nurse ("RN") program consists of two years of full-time training and education. These two years must include a minimum of 290 hours of nursing theory, 630 hours of clinical practice in nursing care, and 20 hours in biological, physical, and social and behavioral sciences. Colorado Rules and Regulations for Approval of Professional Educational Programs in Nursing, § 43(b) (authorized by C.R.S. § 12–38–108(1)(a)).

Similarly, in Colorado, a Licensed Practical Nurse ("LPN") program consists of one year of full time training and education. This year includes a minimum of 400 hours of theory instruction in nursing and 315 hours of clinical practice. Colorado Rules and Regulations for Approval of Practical Nursing Programs, § 4.3(d) (authorized by C.R.S. § 12–38–108(1)(a)).

Courts addressing this issue hold persuasively that in order to qualify under the "trained personnel" exception, a person must have qualifications and training similar to that of RNs and LPNs.

> To be entitled to overtime compensation under the "trained personnel" exception to the "companionship services" exemption under the FLSA, a domestic service employee must not only perform services requiring the training of a registered or practical nurse, but must in fact have obtained training comparable in scope and duration to that of a registered or practical nurse.

*Cox*, 55 F.3d at 1310 (75 hours of required training not enough to constitute "trained personnel" under the FLSA); *see also, McCune*, 894 F.2d at 1110 (60 hours of required training not enough to constitute "trained personnel" under the FLSA); *Terwilliger v. Home of Hope, Inc.*, 21 F.Supp.2d 1294, 1303 (N.D.Okla.1998) (160 hours of required training not enough to constitute "trained personnel" under the FLSA); *Toth v. Green River Regional Mental Health/Mental Retardation Bd.*, 753 F.Supp. 216, 217 (W.D.Ky.1989) (27 hours of required training not enough to constitute "trained personnel" under the FLSA).

Colorado's requirements for RNs and LPNs are far more stringent than the training requirements for a CNA. Prior to becoming a CNA in Colorado, only 75 hours of formal training are required as opposed to the 940 hours required of a RN and the 715 hours required of a LPN.

Further, Mr. Armani qualified to take the CNA exam by receiving none of the 75 hours of formal CNA training, instead receiving approved "on-the-job training." Therefore, I conclude that Mr. Armani is subject to an exemption under the FLSA and grant Maxim's motion for summary judgment with respect to Mr. Armani's FLSA claim for overtime compensation.

## IV.

■ I next address Mr. Armani's claim of promissory estoppel. Mr. Armani alleges that Maxim promised to compensate him for earned overtime. (Complaint, ¶ 26). He alleges that he justifiably relied on these promises by continuing to work for Maxim and suffered damages as a result. Mr. Armani argues preliminarily, and I agree, that this claim may survive summary judgment on the FLSA claim because a promise to pay overtime compensation, even if not required under the FLSA, could be enforced independently under a theory of promissory estoppel or breach of contract.

Maxim moves for summary judgment of this claim based on Mr. Armani's resume fraud. He represented in his employment application that he had not been convicted of a felony and had received his high school diploma. This resume fraud is not a disputed fact as Mr. Armani concedes, "I did mislead Maxim in not disclosing my conviction ..." (Armani Affidavit, ¶ 36). Mr. Armani concedes that he was convicted of two felonies and didn't complete high school.

■ The after-acquired evidence doctrine shields an employer from liability or limits relief where, after a termination, the employer learns for the first time about an employee's wrongdoing that would have caused the employer to discharge the employee. See *Crawford Rehabilitation Services, Inc. v. Weissman*, 938 P.2d 540, 546 (Colo.1997). Where the employee commits resume fraud, the after-acquired evidence doctrine provides an employer a defense if the employer would not have hired the employee if it had known of the fraud. See *id.*

As stated by the Colorado Supreme Court, "[b]asic principles of law and equity support a rule allowing an employer to avoid liability for breach of implied contract or promissory estoppel claims arising from an employment relationship induced by an employee's fraud." *Id.* at 547. The court held that an employer who has been fraudulently induced to hire an employee may rescind employment agreements. See *id.* In *Crawford*, the employment agreement was contained in a manual concerning termination procedures. Because of the resume fraud, the court held that the employer was entitled to rescind the contract contained in the manual. Following Colorado law, I hold that Mr. Armani's resume fraud entitles Maxim to rescind any promise that it may have made in regard to overtime compensation.

■ The Colorado Supreme Court based its decision on the maxim that, "he who seeks equity should do equity and come with clean hands." *Id.* (citing *Golden Press, Inc. v. Rylands*, 124 Colo. 122, 235 P.2d 592, 595 (1951)). Thus, "[a]n employee who engages in resume fraud does not have 'clean hands' and is not entitled to hold an employer liable under a theory of promissory estoppel." *Id.* Promissory estoppel is based on principles of equity. See *Soderlun v. Public Service Co. of Colorado*, 944 P.2d 616, 620 (Colo.App. 1997) ("the concept of promissory estoppel was developed by equity to enforce, in appropriate circumstances, a unilateral promise for which no consideration was provided."). Colorado courts have held that "affirmative relief will be denied one who does not come into a court of equity with clean hands." *McCann v. Jackson*, 163 Colo. 163, 429 P.2d 265, 266 (Colo. 1967). Therefore, Mr. Armani's "unclean hands" bar his equitable claim for promissory estoppel.

■ Like the claims in *Crawford*, Mr. Armani's claim "relate[s] to a private con-

tract or promise between an employer and employee and do[es] not raise any public-policy concerns, other than the general interest society has in the integrity of the employment relationship between employer and employee." *Crawford,* 938 P.2d at 549. This is in contrast to claims under the ADEA and Title VII which share the common purpose of elimination of discrimination in the workplace and are not completely barred by after-acquired evidence. *See McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). Thus, under Colorado law, after-acquired evidence of resume fraud "may provide an employer with a complete defense to [promissory estoppel]." *Crawford,* 938 P.2d at 549.

▄ In order to establish the defense of resume fraud, Maxim must show the fraud is "material" such that a reasonable, objective employer would not have hired the employee if it had discovered the misrepresentation at the outset. *See id.* *Crawford* instructs that the following factors are relevant to this inquiry: whether a reasonable employer would have regarded the misstated fact as important; and whether the employee misrepresented the fact with the intent to create a false impression in the mind of the employer. *See id.*

▄ The first prong of the test is met given the nature of Mr. Armani's misrepresentations. Mr. Armani stated in his employment application that he had never been convicted of a felony and he had attended four years of high school and received his high school diploma. In fact, Mr. Armani was convicted of two felonies, one in California for grand theft of property and one in Nevada for use of a stolen credit card. (Armani Deposition, p. 126). Both of these convictions occurred only three years before his employment with Maxim as an in-house CNA. A reasonable employer would have considered these misstatements important. (Cahal Deposition, pp. 101–106); (Christianson Deposition, pp. 128–129); (Kieffer Deposition, pp. 88–91).

As to the second prong, Mr. Armani admits that he concealed his conviction. (Armani Affidavit, ¶ 36). In his deposition, Mr. Armani also admitted that he intended to create a false impression with Maxim. (Armani Deposition, p. 124, 128, 132).

I conclude, as a matter of law, that Maxim's defense of after-acquired evidence of resume fraud as delineated by the Colorado Supreme Court in *Crawford* bars Mr. Armani's promissory estoppel claim. There are no genuine issues of material fact remaining and, therefore, I grant summary judgment on Mr. Armani's claim for promissory estoppel.

Because Mr. Armani's resume fraud bars this claim, I need not address Maxim's alternative argument that he has not established the required elements of promissory estoppel.

**V.**

Mr. Armani's next claim for relief is under Colorado's Wage Claim Act for failure to pay unpaid wages. C.R.S. § 8–4–104. He concedes that this claim is supported only by his claims for overtime compensation under the FLSA and promissory estoppel. (Opposition, ¶ 51). Thus, because these two claims are dismissed, this claim must also be dismissed.

**VI.**

Mr. Armani's next claim is for fraud and is based on Maxim's alleged promises of overtime compensation. Mr. Armani argues that these promises induced justifiable reliance on his part and were made with the intent to deceive him.

Maxim moves for summary judgment of this claim because it is based on the same allegations of "promises" and "reliance" made in Mr. Armani's promissory estoppel claim. Maxim argues that Mr. Armani "has recycled his promissory estoppel claim as one for fraud." (Maxim's Summary Judgment Brief, p. 20). Maxim then

states that, "Colorado does not recognize an independent tort action for mere breach of a promise or contract." *Id.*

■ Maxim is generally correct in its statement of the law. "Colorado law does not recognize an independent tort action for breach of ... contractual duties." *Centennial Square, Ltd. v. Resolution Trust Co.*, 815 P.2d 1002, 1004 (Colo.App. 1991). This is the rule in cases involving negligence and other, similar tort claims based on breaches of contractual duties. However, this rule does not apply to a tort claim of fraud based on deceit. *See United States Welding, Inc. v. Burroughs Corp.*, 640 F.Supp. 350, 352 (D.Colo.1985) (treating a claim for fraudulent misrepresentation differently than a claim for negligent misrepresentation); *Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22, 23 (10th Cir. 1984) (recognizing exceptions for fraud and unconscionability).

Furthermore, Maxim's reliance on *Brody v. Bock*, 897 P.2d 769 (Colo.1995), runs counter to its argument. There, an employer allegedly made an oral promise to an employee that as long as the employee continued to work for the company, the employer would make certain bequests in his will to the employee. When the promise was broken, the employee sued for both breach of contract and fraud.

■ The court set out the elements to establish a prima facie case of fraud: "a plaintiff must present evidence that the defendant made a false representation of a material fact; that the party making the representation knew it was false; that the party to whom the representation was made did not know of the falsity; that the representation was made with the intent that it be acted upon; and that the representation resulted in damages." *Id.* at 776. A claim of fraud may be based on a defendant's promise concerning a future act, coupled with the present intention not to fulfill the promise. *See id.*

The Colorado Supreme Court stated:

the trial court determined that Bock could not pursue his common-law fraud claim in tort because Brody's representations were the same representations that formed the substance of the alleged oral contract. The conclusion does not follow from the premise. The gravamen of Bock's fraud claim is not Brody's breach of an alleged oral agreement. The gravamen of the fraud claim is the allegation that Brody knowingly made a false representation concerning a present intention to perform a future act. Oral representations are sufficient to establish a claim of fraud. The fact that such alleged representations constitute the substance of Bock's breach of contract claim does not require dismissal of his tort claim.... A contrary conclusion would encourage and condone fraudulent behavior.

*Id.* at 776 (citations omitted).

■ Mr. Armani alleges that Maxim promised him, more than once, that he would be paid overtime compensation. These promises allegedly induced reasonable reliance by Mr. Armani resulting in his continuing to work overtime hours. Mr. Armani states that, "the promises related to both a promise to pay overtime in the past, a reaffirmation of past promises to pay, *and promises to pay overtime in the future.*" (Opposition, p. 25). Mr. Armani also alleges that the "statements were false when made, or made in reckless disregard for their truth or falsity," and, further, that the misrepresentations were made "with the intent to deceive and mislead the plaintiff." (Complaint, ¶¶ 33, 36). Thus, I conclude that under Colorado law, Mr. Armani's fraud claim is not barred solely because it is based on allegations of a promise.

■ Maxim also challenges Mr. Armani's fraud claim under Rule 9(b) requiring the circumstances constituting the fraud to be pled with specificity. Dismissal of a claim for failing to satisfy Rule 9(b) is treated as a dismissal under Rule 12(b)(6) for failure to state a claim upon which

relief may be granted. *See Ambraziunas v. Bank of Boulder,* 846 F.Supp. 1459, 1462 (D.Colo.1994). In ruling on a motion to dismiss under Rule 12(b)(6), all factual allegations must be accepted as true and all reasonable inferences must be drawn in favor of the pleader. *See Brooks v. Bank of Boulder,* 911 F.Supp. 470, 473 (D.Colo. 1996). A claim should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief. *See id.*

▇▇▇ Pursuant to Rule 9(b), the Complaint must describe the specific representations which are allegedly fraudulent, where and when the statements were made, the particular defendant who made the misrepresentations, and the falsity of the representations. *See Gardner v. Investors Diversified Capital, Inc.,* 805 F.Supp. 874 (D.Colo.1992). "The point of the rule is to provide enough notice to each defendant of the misrepresentations the defendant made so that he can answer and otherwise defend himself." *Id.* at 876. However, as an exception to the rule that pleadings should be simple, concise and direct, "rule 9 is read restrictively, not expansively." *Id.* Plaintiffs are not required to plead extensive facts, only the circumstances of the fraud.

▇▇▇ In his Complaint, Mr. Armani sufficiently outlines the allegedly fraudulent misrepresentations: "Defendant promised Plaintiff $850.00 a week in lieu of overtime"; "Defendant … agreed to compensate the Plaintiff for his overtime at an undetermined point in the future"; "Defendant … admitted again to Plaintiff that he was entitled to overtime compensation … and that arrangements would ultimately be made to pay it"; "promises and assurances that he would be ultimately compensated for all overtime he incurred"; and "representations made to him that he would not suffer prejudice for having worked overtime." (Complaint, ¶¶ 10, 12, 13, 32, 34).

Mr. Armani also alleges approximately where and when the statements were made. He alleges that they were made in meetings with Defendant's agents in October, 1996, and in late November or early December of 1996. (Complaint, ¶¶ 10, 13). At least as to the alleged statements occurring on these dates, the averments of fraud are sufficient under the rule; as to any other statements that Mr. Armani may try to rely on, I conclude that they have not been pled with the requisite specificity to show where and when the statements were made. *See Barrett v. Tallon,* 30 F.3d 1296, 1300 & n. 3 (10th Cir.1994).

Mr. Armani specifically alleges that the following representatives or agents of Maxim made the fraudulent statements: "Lori Christianson, Pam Cahal, Holly (last name unknown), Kim Kieffer, and Isabelle (last name unknown)." Finally, Mr. Armani alleges that the representations were false:

> these statements were false when made, or made in reckless disregard for their truth or falsity. The falsity of these claims may be properly inferred on the conduct and actions of the Defendant in failing to make any attempts to pay the Plaintiff overtime compensation earned in the past subsequent to the making of the representations, and by the fact that the Defendant is now taking the position that no such promises were ever, in fact, made and no overtime compensation is due and owing.

(Complaint, ¶ 33).

I conclude that under Rule 9(b), Mr. Armani sufficiently pled fraud. Because there are issues of material fact with respect to the existence and content of these alleged promises, and because there are remaining issues of fact with respect to Maxim's intent when making these promises, summary judgment is inappropriate and is denied on this claim.

▇▇▇ I note that other than contending Mr. Armani has repackaged his contract based on promissory estoppel claim as a

claim in tort for fraud, Maxim has not specifically argued the application of the after-acquired evidence rule of *Crawford* to this claim. Because *Crawford's* holding is limited to claims sounding in contract, I decline to extend it to a claim sounding in tort.

## VII.

Mr. Armani's final claim is for constructive discharge/wrongful discharge. He claims that he was constructively discharged by Maxim when Maxim reduced his pay from $14 to $9 per hour. Mr. Armani claims that because this reduction was based on his claim for overtime pay and his procurement of a lawyer, he was wrongfully discharged in violation of public policy.

■■■ Mr. Armani concedes that he was an at-will employee. In Colorado, an employee who is hired for an indefinite period of time is an "at-will employee" whose employment may be terminated by either party without cause and without notice. *See Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 711 (Colo.1987). Generally, Colorado law does not recognize a cause of action for the wrongful discharge of an at-will employee. *See Schur v. Storage Technology Corp.,* 878 P.2d 51, 54 (Colo.App.1994) ("in a case in which the evidence establishes that there was no definite term of employment agreed upon by the parties, any claim of improper discharge made by the employee must be dismissed."). However, there is a narrow "public policy" exception to this rule.

■■■ The essence of the public policy exception is that an employee has a cognizable claim for wrongful discharge "if the discharge of the employee contravenes a clear mandate of public policy." *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 107 (Colo.1992). Under Colorado law, an at-will employee has a cause of action for public policy wrongful discharge if he can show that: (1) the employer directed the employee to perform an illegal act as part of the employee's work related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege; (2) the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; (3) and the employee was terminated as the result of refusing to perform the act directed by the employer. *See id.* at 109.

Maxim contends that Mr. Armani was never constructively or actually discharged. Even assuming a constructive discharge, Maxim argues that Mr. Armani has not alleged a viable public policy claim and, alternatively, that Mr. Armani's resume fraud should bar his claim.

■■■ Mr. Armani concedes that he resigned from his employment. (Complaint, ¶ 43). However, he asserts that Colorado recognizes the doctrine of "constructive discharge." To prove a constructive discharge, "a plaintiff must present sufficient evidence establishing deliberate action on the part of an employer which makes or allows an employee's working conditions to become so difficult or intolerable that the employee has no other choice but to resign." *Wilson v. Board of County Com'rs of Adams County,* 703 P.2d 1257, 1259–1260 (Colo.1985).

■■■ Maxim contends that under Colorado law, mere cuts in pay do not rise to the level of constructive discharge. However, the Colorado courts have not yet answered this question, and the cases cited by Maxim do not clearly stand for this proposition. *See, e.g., Allen v. Bridgestone/Firestone, Inc.,* 81 F.3d 793, 797 (8th Cir.1996) ("a reduction in pay *does not necessarily* constitute a constructive discharge.") (emphasis added). Instead, "the determination of whether the actions of an employer amount to a constructive discharge depends upon whether a reasonable

**1132**

person under the same or similar circumstances would view the new working conditions as intolerable, and not upon the subjective view of the individual employee." *Wilson,* 703 P.2d at 1259–1260.

Even assuming that Mr. Armani's reduction in pay constitutes a deliberate action on the part of Maxim which made Mr. Armani's working conditions so intolerable that he had no other choice but to resign, I conclude that Mr. Armani has not alleged a cognizable claim under the public policy exception to the at-will doctrine sufficient to establish a wrongful discharge claim.

■ Mr. Armani centers his public policy wrongful discharge claim on his FLSA-based complaints to Maxim and alleged retaliation. However, the public policy wrongful discharge exception is not available where, as here, the FLSA provides the employee with a remedy for retaliation. *See* 29 U.S.C. § 215(a)(3) (providing a cause of action for employees retaliated against for asserting FLSA rights); *Smith v. Colorado Interstate Gas Co.,* 777 F.Supp. 854, 858 (D.Colo.1991) (quoting *Gamble v. Levitz Furniture Co.,* 759 P.2d 761, 766 (Colo.App.1988)). Mr. Armani failed to avail himself of these remedies.

■ Mr. Armani also bases his public policy wrongful discharge claim on the allegation that he was discharged for hiring a lawyer in connection with his FLSA claim. This is again inadequate because under the narrow scope of Colorado's public policy exception, there is no statute or "clearly expressed public policy" granting employees the right to consult an attorney based on perceived transgressions. As stated by the Colorado Supreme Court, "[n]ot all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment. We must develop the common law in this area with care." *See Crawford,* 938 P.2d at 553. None of the cases cited by Mr. Armani state that the mere hiring of an attorney is a public policy right sufficient for a wrongful discharge claim.

Because I conclude that Mr. Armani is barred from bringing a public policy wrongful discharge claim based on his complaints under the FLSA and the hiring of an attorney, I need not reach the issue whether his resume fraud would bar the claim under the after-acquired evidence rule. *See Crawford,* 938 P.2d 540 (Colorado Supreme Court reserved the issue whether a wrongful discharge claim is barred by the after-acquired evidence doctrine).

**VIII.**

■ FLSA § 215(a)(3) provides that it is unlawful for any person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA] ..." Mr. Armani has never alleged a claim under this provision of the FLSA. The first time that he mentioned this basis for relief was one year after filing his Complaint in his February 4, 1999, Opposition to Maxim's Motion for Summary Judgment (¶¶ 81–84). I will not allow him to amend his Complaint through his brief to include this claim.

In his Complaint, Mr. Armani makes a claim for "Constructive Discharge/Wrongful Discharge." He does not reference any statutory provision. Instead, his claim is titled and framed in terms of state common law. This is evident in light of his other statutory claims for relief where he has explicitly cited the governing statute. In his first claim under the FLSA he cites 29 U.S.C. § 203. In his claim for relief under the Colorado Wage Claim Act he includes a cite to the statutory provision in his subtitle, C.R.S. § 8–4–104. In contrast, his remaining common law claims have no statutory cites or references. Furthermore, in the Scheduling Order and Final Pretrial Order, no mention is made of a claim under § 215(a)(3).

Instead, the first mention of § 215(a)(3) came in Mr. Armani's Opposition to Maxim's Motion for Summary Judgment.

(¶¶ 81–84). In a section of his brief entitled "Mr. Armani Has Alleged a Viable Public Policy Claim," he states that § 215(a)(3) provides sufficient public policy in regards to a wrongful discharge claim. (Opposition, ¶ 81). He goes on to recognize, for the first time, that "Section 215(a)(3) prohibits retaliation under the FLSA." (Opposition, ¶ 82).

I agree with Maxim that,

> plaintiff *raises for the first time* the retaliation provision of the FLSA ... as a basis for his wrongful discharge claim. Response ¶¶ 81–84. At no time previously during this litigation has plaintiff ever mentioned or cited § 213(a)(3). Because plaintiff chose not to bring a claim pursuant to section 215(a)(3) in this lawsuit, this provision is irrelevant.... The deadline for amending pleadings has long since passed and discovery is closed.

Thus, I conclude that Mr. Armani cannot amend his complaint at this late date to include a claim under FLSA § 215(a)(3).

Accordingly, I ORDER that:

(1) Defendant Maxim's motion for summary judgment is GRANTED with respect to Mr. Armani's claims for failure to pay overtime under the FLSA, promissory estoppel, failure to pay unpaid wages under Colorado's Wage Claim Act, and constructive discharge/wrongful discharge; and

(2) Defendant Maxim's motion for summary judgment is DENIED with respect to Mr. Armani's claim for fraud.