**J. Bradley ANDERSON and Martie Lynn Anderson, Plaintiffs,**

v.

**ROYAL CREST DAIRY, INC., a Colorado corporation, Defendant.**

**No. CIV.A. 01–K–2096.**

United States District Court, D. Colorado.

March 17, 2003.

Ronald E. Gregson, Gregson and Pixler, P.C., Denver, CO, for Plaintiffs.

Dana L. Eismeier, Melody Rae Divine, Burns, Figa & Will, P.C., Englewood, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

Plaintiff Bradley Anderson suffered a back injury on the job and was terminated from his employment with Defendant Royal Crest Dairy ("Royal Crest") when he could not return to work four months later. His termination, however, occurred twelve days after he hired an attorney to process his worker's compensation claim and Anderson claims it was retaliatory. Anderson's termination, moreover, resulted in the cancellation of his employer-funded health insurance benefits and, for a period of five weeks before those benefits could be reinstated under COBRA,[1] Anderson's wife, who suffered from multiple sclerosis, could not fill numerous prescriptions or undergo necessary tests and monitoring for her treatment. The Andersons filed suit, asserting a federal claim for COBRA notice violations in addition to a state law claim on Mr. Anderson's behalf for wrongful termination.

The matter is before me on a series of piecemeal Motions for Partial Summary Judgment and for Dismissal filed by Defendant Royal Crest. The gist of Defendant's Motions are that (1) Anderson's wrongful termination claim should be dismissed "to the extent it is premised on the averment that Anderson was terminated for hiring an attorney," on grounds Colorado law does not recognize such a cause of action and (2) Royal Crest is entitled to summary judgment on the remaining aspects of Mr. Anderson's wrongful termi-

nation claim as well as the ERISA claim for untimely notification under COBRA. The motions are denied.

### I. *Background.*

Plaintiffs Bradley and Martie Anderson are citizens of the United States and reside in Elbert County, Colorado. Defendant Royal Crest is a Colorado corporation doing business in the City and County of Denver. Royal Crest hired Mr. Anderson as a route delivery driver on July 8, 1996.

In the early morning hours of November 1, 2000, Mr. Anderson injured his back while loading his truck. He was 35 years old at the time. Anderson immediately notified Royal Crest, returned his truck to the dairy and completed an injury report. Anderson notified Royal Crest's Risk Manager Asa Ratliff, who instructed him to go home and "use simple remedies, ice, stretches, things of that nature, before actually filing a comp claim." (Am. Br. Opp'n Def.'s Mot. Partial Summ. J. (ERISA) Ex. 2, Ratliff Dep. at 5.) Ratliff also completed a workers' compensation report. (Def.'s Mot. Partial Summary J.(Wrongful Termination) Ex. B, Employer's First Report of Injury dated Nov. 8, 2000.)

Anderson was referred to Royal Crest's workers' compensation physicians' group later that same day, and was seen by Dr. Clarence Henke of the Rocky Mountain Medical Group. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. A, Anderson Dep. at 15.) Dr. Henke diagnosed Mr. Anderson with a "strained/sprained lumbar" with a "locked facette" and prescribed medications and physical therapy. (Compl. ¶ 9.) On November 15, 2001, the workers' compensation insurance

---

1. The Consolidated Omnibus Budget Act, 29 U.S.C. §§ 1161–1168 (COBRA) was enacted to ensure the continuing coverage of employee health insurance benefits under certain circumstances under the Employee Retire-

ment Income Security Act, 29 U.S.C. § 1132 (ERISA). Any failure to comply with COBRA notice provisions constitutes a violation of ERISA. (cite)

carrier admitted liability for temporary total disability benefits at a rate of $410.00 per week. (Def.'s Mot. Partial Summ. J.(Wrongful Termination) Ex. C, General Admission of Liability.) As a result of his injury, Anderson was completely unable to work for the months of November, December and part of January. During this time Anderson continued to undergo treatment—which included selective nerve root blocks, a general lumbar translaminar epidural and physical therapy—and substantial medication for his pain. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. D, Dr. Lockwood Evaluation dated Jan. 11, 2001.)

In mid-January, Anderson was released for light duty/sedentary work 3–4 hours per day. He returned to work on January 15, 2001, but experienced severe back pain and cramping. He was excused from work for another week on January 16. Anderson saw Dr. Lockwood for a followup visit on January 25, 2001. Dr. Lockwood expressed concern that the injections and nerve blocks were not relieving Anderson's pain (noting one, in fact, seemed to exacerbate it) and discussed with Anderson the options of other pain management paradigms or surgical intervention. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex J, Dr. Lockwood Evaluation.) Dr. Lockwood expressed a desire that Anderson continue in a work environment, however, stating Anderson could work in a sedentary capacity for three hours a day. (*Id.*) Anderson did not, however, return to work.

On February 16, 2001, Anderson retained an attorney to process his workers' compensation claim. On February 20, 2001, attorney Peter H. McGuire entered his appearance with the Division of Workers Compensation and wrote to Royal Crest, enclosing a release signed by Mr. Anderson. On February 22, 2001, Ratliff faxed the letter to Chad Saunders, Claims Adjuster with Liberty Mutual, in order to inform the workers' compensation insurance carrier that Mr. Anderson had retained counsel. The next day, February 23, 2001, Ratliff telephoned Anderson and told him that he would be receiving termination papers. (Am. Br. Opp'n Def.'s Mot. Partial Summ. J. (ERISA) Ex. 2, Ratliff Dep. at 19–20.) According to Anderson, Ratliff was upset and yelled at him on the telephone for retaining counsel. Ratliff confirmed his feelings were "hurt" and "upset" that Anderson had retained an attorney. (Ratliff Dep. at 18–19.) Citing conversations with both Anderson and his treating doctors, Ratliff in a letter dated February 28, 2001, stated it was "apparent" Anderson would not be able to return to his "full duties as a route delivery person" and notified Anderson of the company's decision to terminate his employment. (*Id.* Ex. L, Letter from Ratliff to Anderson.) Ratliff further asked that Anderson reimburse "Royal Crest for Insurance and dental coverage's [sic] for the months of December 2000, January 2001 and February 2001." *Id.*

At the time of Mr. Anderson's termination, Royal Crest was aware that Martie Anderson suffered from multiple sclerosis and depended on her husband's employee health insurance for her treatment and care. (Ratliff Dep. at 36.) According to Royal Crest, Mr. Anderson's termination constituted a "qualifying event" that resulted in a cancellation of his health insurance. The Andersons did not discover the cancellation, however, until March 13, 2001, when they attempted to refill Mrs. Anderson's prescriptions and were told by the pharmacist that she no longer had insurance coverage. (Am. Br. Opp'n Def.'s Mot. Partial Summ. J. (ERISA), Martie Anderson Aff. ¶ 4.) Mrs. Anderson immediately contacted Royal Crest's benefits manager, Keith Gaertner, explaining that she had been unable to fill necessary pre-

scriptions and begging him to reinstate the insurance. (Am. Br. Opp'n Def.'s Mot. Partial Summ. J. (ERISA), Gaertner Dep. at 14.) Gaertner could detect urgency in Mrs. Anderson's voice and assumed this was due to her multiple sclerosis. (*Id.* at 15.) Mrs. Anderson telephoned Gaertner several times over the next few days, explaining the urgency of her receiving needed tests and asking when she and her husband could anticipate receiving a Notice of Continuing Coverage, i.e. COBRA, letter from Royal Crest. (Am. Br. Opp'n Def.'s Mot. Partial Summ. J. (ERISA), Martie Anderson Aff. ¶ 7–8.) Gaertner assured Mrs. Anderson that the notice of continued coverage would be coming from COBRA compliance and agreed to call to find out the status of the letter. (Gaertner Dep. at 16.)

In fact, Gaertner had sent the Qualifying Event Form to COBRA Compliance Systems, Inc. ("CCS"), Royal Crest's off-site service provider, the same day he received Mrs. Anderson's first panicked call, March 13, 2001. (Def.'s Mot. Partial Summ. J. (ERISA) Ex. C, Qualifying Event Form.) CCS sent the Andersons their Notice of Continuing Coverage thirteen days later on March 26, 2001, and the Andersons returned the election form on April 1, 2001. (*Id.* Ex. F, COBRA Continuation Coverage Election Form.) The Andersons' insurance coverage was reinstated April 4, 2001, and made retroactive to February 28, 2001. (*Id.* Ex. G, COBRA Continuee Form.) From the time their insurance was cancelled on February 28, 2001 until its reinstatement on April 4, 2001, Mrs. Anderson was unable either to fill her prescriptions or to undergo necessary medical tests such as an MRI, catscan and blood tests necessary for the monitoring and treatment of her multiple sclerosis. (Martie Anderson Aff. ¶ 7–10.)

CCS is a service company designed to assist employers with COBRA administration and compliance. The services CCS provides include writing COBRA notices, sending the notices, receiving elections from qualified beneficiaries, sending COBRA billing statements, and adjudicating COBRA premiums. Royal Crest has contracted with CCS since January 29, 1998. Under the contract, Royal Crest is the employer and plan administrator and CCS is the off-site service provider for Royal Crest. As the off-site service provider, CCS is required to accomplish and perform the duties and responsibilities stated in 29 U.S.C. § 1161, *et seq.*, including providing requisite notification to employees on behalf of Royal Crest.

After Mr. Anderson's termination, the Andersons' attorney wrote a letter to Royal Crest requesting the company reconsider its position with respect to Mr. Anderson's employment. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. M, Letter from McGuire to Ratliff dated March 6, 2001.) McGuire asked Royal Crest to wait until Mr. Anderson was placed at maximum medical improvement before it decided whether or not to terminate his position. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. M, Letter from McGuire to Ratliff dated March 6, 2001.) In response to McGuire's request, Ratliff stated Royal Crest would reconsider Mr. Anderson's return to Royal Crest if Mr. Anderson provided medical documentation verifying he could return to work. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. N, Letter from Ratliff to McGuire dated March 14, 2001.)

In a letter dated June 13, 2001, Ratliff restated that Royal Crest would consider rehiring Mr. Anderson if he provided medical documentation demonstrating he could do so. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. P, Letter from Ratliff to Attorney Gregson dated

June 13, 2001, *see also* Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. H, Workman's Compensation Follow Up Log.) Although Dr. Henke completed a supplemental physician's workers' compensation report on March 15, 2001, stating Anderson could return to restricted duty (sitting/sedentary work only) as of that day (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. O, Rocky Mountain Medical Group Physician's Supplemental Report), Anderson never provided Royal Crest with any medical documentation showing he could return to work. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. A, Anderson Dep. at 96–97, 102–103.) In his deposition, Anderson explained that he failed to provide any medical documentation during that time period because he was without insurance and could not afford to pay for a doctor's visit out of his own pocket. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. A, Anderson Dep. at 96–97, 102–103.)[2] Anderson claims he still had not reached maximum medical improvement and believes to this day that he cannot return to work due to the injuries he suffered on November 1, 2000. (Def.'s Mot. Partial Summ. J. (Wrongful Termination) Ex. A, Anderson Dep. at 20, 62.)

Royal Crest moves for summary judgment on the Andersons' first claim for relief for violating COBRA notification requirements under ERISA, arguing it complied with COBRA by providing notification to the Andersons within 26 days of the

qualifying event. Royal Crest argues CCS is the administrator for purposes of CO-BRA, and thus under 29 U.S.C. § 1166, the proper notice period for continued coverage is 44 days.[3] In the alternative, Royal Crest argues that if the court should conclude it is the administrator and not CCS, as employer and administrator Royal Crest was still entitled to 44 days to provide continuation notification to covered employees and qualified beneficiaries under 29 U.S.C. § 1166.

With respect to Mr. Anderson's second claim for relief for wrongful termination, Royal Crest filed its Motion for Partial Summary Judgment and Motion to Dismiss on the same day. In the former, Royal Crest denies Anderson was terminated for any reason other than his inability, or unwillingness, to return to work and contends Anderson has failed to create a genuine factual dispute that he was terminated in retaliation for having been injured and seeking workers' compensation benefits. To the extent Anderson's wrongful termination claim is premised on the averment that he was terminated for hiring Mr. Maguire, Royal Crest moves to dismiss that claim, arguing Colorado law does not recognize an exception to the principle of "at will" employment for such a termination.

## II. *Standard of Review*

Summary judgment is appropriate only when the pleadings, depositions, answers

---

2. It should be noted that Dr. Henke's evaluation was completed as part of Anderson's worker's compensation claim at the behest of Royal Crest's workers' compensation insurance carrier. The Supplemental Report (a preprinted form in which the worker's compensation physician checks off boxes corresponding to his recommended work limitations and restrictions) was just that, a form, prepared for Royal Crest as part of Royal Crest's processing of Anderson's worker's compensation claim. Neither Dr. Henke, nor

Dr. Lockwood, for that matter, were independent treating physicians.

3. An employer of an employee under a plan shall notify the administrator of a qualifying event within 30 days of the date of the qualifying event and the administrator shall then notify any qualified beneficiary of such event and his continued rights within 14 days of the date on which the administrator is notified of the qualifying event. 29 U.S.C. §§ 1166(a)(2) and (c).

to interrogatories, admissions, or affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Pleadings and documentary evidence must be construed in favor of the non-moving party. *Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793 (10th Cir.1993). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon such a showing, the burden shifts to the non-moving party. *Bacchus Indus., Inc. v. Arvin Indus. Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The non-moving party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue. F.R. Civ. P. 56(e); *see also Otteson v. United States,* 622 F.2d 516, 519 (10th Cir.1980).

Furthermore, the adequacy of the non-moving parties' opposition to a motion for summary judgment shall be determined by whether based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Id.* at 252, 106 S.Ct. 2505.

### III. *Discussion*

### A. Wrongful Termination Claim

 Since 1876, Colorado has recognized an employee who is hired for an indefinite period is an "at-will" employee and as such may be terminated without cause and without notice by either party to the employment, and whose termination does not give rise to a cause of action. *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 711 (Colo.1987)(citing *Kansas Pac. Ry. Co. v. Roberson,* 3 Colo. 142 (1876)). However, Colorado has also carved out a policy exception to the at-will employment doctrine. To assert a claim for wrongful discharge under the public policy exception, an at-will employee must show:

(1) that the employer directed the employee to perform an illegal act as part of the employee's work related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege;

(2) that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker;

(3) that the employee was terminated as the result of refusing to perform the act directed by the employer; and

(4) that the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker.

*Martin Marietta, Corp. v. Lorenz,* 823 P.2d 100, 109 (Colo.1992).

Mr. Anderson contends his termination was wrongful under this standard because he was fired for exercising his job-related right to seek worker's compensation and to do so with the assistance of an attorney.

As set forth above, Royal Crest moves to dismiss Anderson's wrongful termination claim "to the extent it is premised on the averment that Anderson was terminated for hiring an attorney" and for summary judgment on the remaining aspects of the claim (i.e., that Anderson was terminated for seeking worker's compensation benefits). Royal Crest's intent in parsing the grounds for the wrongful termination claim is to eliminate from consideration on its Motion for Summary Judgment evidence concerning the hiring of Mr. Maguire and Mr. Ratliff's reaction when he learned Anderson had done so.[4] The litigation tactic is unavailing. The events underlying Anderson's claim that his termination was wrongful—i.e. the injury, the filing of a worker's compensation claim and the hiring of a worker's compensation attorney—are averred as part of a single course of wrongful conduct. They will not be subjected to the piecemeal attack attempted here. Accordingly, Royal Crest's Motions to Dismiss and for Partial Summary Judgment directed to Anderson's wrongful termination claim will be treated as a single Motion for Summary Judgment.[5]

Mr. Anderson contends Royal Crest terminated him in retaliation for having been injured on the job, pursuing a workers' compensation claim and then hiring an attorney to assist him in doing so. Colorado courts have explicitly recognized an employee's claim for wrongful discharge in violation of public policy if the employee is discharged in retaliation for pursuing a worker's compensation claim. *Lathrop v. Entenmann's, Inc.*, 770 P.2d 1367 (Colo. App.1989) (to permit an employer to discharge an employee in retaliation for the employee pursuing a workmen's compensation claim would allow employers to discourage or prevent employees from seeking the benefits due them under the Workers' Compensation Act, § 8–4–101, *et seq.*, and undermine the fundamental purposes of the worker's compensation system). The Colorado Supreme Court has also recognized that an employee is granted the specific right to apply for and receive compensation under the Workers' Compensation Act and an employee who is terminated for exercising this right may state a cognizable claim for wrongful discharge in violation of public policy. *Crawford Rehabilitation Services, Inc. v.*

4. I note Royal Crest in its Motion to Dismiss asks me to strike Paragraph 32 of the Andersons' Complaint—the reference to their having hired an attorney—and to exclude at trial any evidence of Plaintiffs having retained a workers' compensation attorney or discussion of that fact with Defendant representatives pursuant to F.R.E. 401 and 403.

5. For the record, I note Royal Crest's reliance on *Armani v. Maxim Healthcare Servs., Inc.*, 53 F.Supp.2d 1120 (D.Colo.1999) to support the assertion that Colorado courts will not recognize the hiring of an attorney claim as a sufficient public policy right to support a claim for wrongful termination is unpersuasive. In *Armani*, Judge Babcock rejected a wrongful termination claim based on the assertion that plaintiff was constructively discharged after hiring an attorney to look into

potential FLSA violations, ruling Colorado's "public policy wrongful discharge exception is not available where, as here, the FLSA provides the employee with a remedy for retaliation." *Id.* at 1132. In dicta, Judge Babcock also discounted the availability of a remedy under Colorado law for termination premised on the hiring of an attorney, but did so based on the plaintiff's having hired an attorney only to look into "perceived transgressions." *Id.* ("there is no statute or 'clearly expressed public policy' granting employees the right to consult an attorney based on perceived transgressions"). Given the nature of Colorado's worker's compensation statutory scheme and the public policy behind it, *Armani* would not support the dismissal of Anderson's wrongful termination claim once Anderson had suffered a work-related injury, which is undisputed.

*Weissman,* 938 P.2d 540, 552 (Colo.1997); *see also Miedema v. Browning–Ferris Industries of Colo.,* 716 F.Supp. 1369 (D.Colo.1989). Accordingly, the issue on summary judgment is whether Anderson has come forward with sufficient evidence to create a triable issue of fact as to the retaliatory motivation of Royal Crest in firing him. I find that he has.

The evidence shows that Mr. Anderson severely injured his back while performing his duties as a route delivery driver for Royal Crest on November 1, 2000. Mr. Anderson immediately notified Royal Crest's Risk Manager Asa Ratliff and completed an injury report. Later in the day on November 1, 2000, Mr. Anderson received medical treatment for his injuries from Royal Crest's workers' compensation doctor. On November 15, 2000, Liberty Mutual, the workers' compensation insurance carrier, admitted liability and Mr. Anderson began receiving benefits at the rate of $410.00 per week. In early January 2001, Mr. Anderson attempted light duty work, however, he continued to experience lower back pain and was removed from light duty work for approximately one week. Mr. Anderson never returned to work, maintaining he could not and had not reached maximum medical improvement.

On February 16, 2001, Mr. Anderson retained a workers' compensation attorney Peter McGuire. On February 20, 2001, McGuire entered his appearance with the Division of Workers' Compensation and wrote Royal Crest seeking documentation concerning Mr. Anderson's employment. On February 22, 2002, Ratliff, notified the claims adjuster for Liberty Mutual that Mr. Anderson had retained an attorney and phoned Anderson the next day to advise him he was going to be terminated.

Ratliff testified in his deposition that he was hurt and angry that Anderson had retained an attorney, and Anderson testified Ratliff further told him he was wasting his money on an attorney. Anderson was terminated by letter dated February 28, 2001.

In the February 28, 2001 termination letter, Ratliff requested Mr. Anderson pay $776.34 to Royal Crest for insurance and dental coverage for the months of December of 2000 and January and February of 2001. Royal Crest also cancelled the Andersons' health insurance coverage on the date of his termination.

■ Construing the pleadings and evidence together with the affidavits and portions of the depositions provided to the Court in favor of the Andersons, a genuine issue of material fact exists as to the whether Royal Crest terminated Mr. Anderson in retaliation for his having filed and pursued a worker's compensation claim and for hiring an attorney to help him do so. The purpose of the public policy exception to the at-will employment doctrine is to prohibit an employer from discharging an employee for reasons contrary to widely accepted public policies. *Crawford Rehabilitation,* 938 P.2d at 552. The Workers' Compensation Act has been deemed such a policy. *See Lathrop,* 770 P.2d at 1372. Naturally, an employee is prohibited from exercising his protected right to pursue a workers' compensation claim if he is discharged for having done so.

The ultimate question of whether Royal Crest had a retaliatory motive in terminating Mr. Anderson is an issue to be determined by the fact finder. Royal Crest's Motion for Summary Judgment is DENIED.

### B. COBRA Notice/ERISA Claim.

■■■ Under COBRA's provisions, an employer has 30 days in which to notify an ERISA-qualified plan administrator of any qualifying event, such as a covered employee's termination, and the administrator, in turn, has 14 days in which to notify the employee of his rights under ERISA as a plan beneficiary. 29 U.S.C. § 1166(a)(2), (4) and (c). Because Royal Crest was both Mr. Anderson's employer and the administrator of the subject plan, the Andersons contend Royal Crest was required to provide Mr. Anderson with notice of his rights and benefits under the plan within 14 days of his termination and violated COBRA's notification requirements by waiting 26 days to notify him. Royal Crest contends it should not be deemed both employer and plan administrator under the circumstances of this case,[6] but asserts a 44 day notice requirement applies in any event under *Roberts v. National Health Corp.*, 963 F.Supp. 512 (D.S.C.1997).

I find the law in this area unsettled, particularly under the unique circumstances that existed in this case at the time Mr. Anderson was fired. *See, e.g., Roberts v. Nat'l Health Corp.*, 963 F.Supp. 512, 515 (D.S.C.1997) (holding forty-four day notice period applies even where employer is also plan administrator); *DiSabatino v. DiSabatino Bros. Inc.*, 894 F.Supp. 810, 817 (D.Del.1995) (forty-four days); *but see Burgess v. Adams Tool Eng'g, Inc.*, 908 F.Supp. 473, 478 (W.D.Mich.1995) (four-

teen days); *Brown v. Neely Truck Line, Inc.*, 884 F.Supp. 1534, (M.D.Ala.1995) (fourteen days). It is true that the Department of Labor addressed the issue in a 1995 opinion letter to Pieter J. Doerr, President and Chief Operating Officer of CCS, concluding an employer who is also the plan administrator shall have 44 days to notify a qualified employee and beneficiary. *See Roberts v. National Health Corp.*, 963 F.Supp. 512 (D.S.C.1997) (citing the Doerr Letter and holding the interpretation of the Department of Labor is reasonable).

In my view, neither the Doerr Letter nor the caselaw relying on it addressed the unique situation that presented itself here. The Doerr Letter, for example, justifies the use of the thirty-day notice period for notifying a plan administrator even where the employer and plan administrator are one and the same because "knowledge that a qualifying event has occurred must often be transmitted from those within an employer with responsibility for employment records to those with responsibility for the plan." (Letter from Susan G. Lahne, Acting Chief, Division of Coverage, Department of Labor, to Pieter J. Doerr, President and Chief Operating Officer, COBRA Compliance Systems, Inc. at p. 4 (April 11, 1995)). This raises the question of what happens when it can be shown the plan administrator/employer had actual notice on the day of the qualifying event. Why,

---

**6.** Royal Crest contends CSS became the "de facto" administrator of Royal Crest's plan pursuant to its agreement to "act and assist" it in handling its duties and responsibilities under 29 U.S.C. § 1161 "and to accomplish and perform those notifications on behalf of [Royal Crest]." Am. Mem. Br. In Opposition to Def.'s Mot. Partial Summ. J. (ERISA), p. 3, and Ex. 12 "Contract for Compliance with COBRA." I disagree. Read in their entirety, the relevant provisions of the parties' Con-

tract clearly show that CCS, as "First Party," agrees to "act and assist the *'Administrator' of the Second Party* [defined in the recitals the COBRA qualified employer, i.e., Royal Crest] ... in relationship to those duties and responsibilities stated in 29 U.S.C.A. § 1611 et seq." (Emphasis added.) The word "act" does not mean "act as," and there is no assumption by CCS of the legal status of plan administrator, *de facto* or otherwise.

under those circumstances, should the administrator be given the benefit of an additional thirty days notice when the COBRA statute specifically says the administrator should have 14?

Most importantly, however, is the *Roberts* court's reasoning for finding the Doerr Letter's approach reasonable. In *Roberts*, Judge Herlong pointed to the fact that the payment of the first premium after COBRA notice was provided and accepted by an employee would "apply retroactively to provide continuous coverage from the date of the qualifying event." 963 F.Supp. at 515. In essence, the determination that a 44–day notice period was reasonable notwithstanding the fact that the employer was also the plan administrator was premised on a concept of "no harm, no foul." Where, as here, the employee (or his wife) suffers from a chronic illness and must forego treatment and medication during whatever notice period applies, the retroactive nature of his coverage means little. I am unwilling at this stage of the proceedings to go with the Department of Labor's interpretation of 29 U.S.C. § 1166(a)(2) and (c). I do not believe the Doerr Letter or the cases that have relied on it since its issuance contemplate the factual situation presented here.

### IV. *Conclusion.*

Based on the foregoing, Royal Crest's Motion for Partial Summary Judgment/Dismissal of Mr. Anderson's wrongful termination is DENIED. I conclude reasonable factfinders could disagree about the reason for Mr. Anderson's termination by Royal Crest. The Motion for Partial Summary Judgment on the ERISA/COBRA claim is also DENIED. I am unwilling, at this stage of the proceedings, to conclude as a matter of law that a 44–day notice period applied to Royal Crest in this case. The issue may, of course, need to be revisited before any trial of Plaintiffs' claims in this case, but I will not rule on it conclusively now.