**Rosa SALYER, Plaintiff–Appellant,**

v.

**OHIO BUREAU OF WORKERS' COMPENSATION and Wesley Trimble, Administrator, Defendants–Appellees.**

No. 95–3531.

United States Court of Appeals,
Sixth Circuit.

Argued May 3, 1996.

Decided May 17, 1996.

Stewart R. Jaffy (argued), Marc J. Jaffy (briefed), Stewart Jaffy & Associates, Columbus, OH, for plaintiff-appellant.

James G. Petrie (argued), Office of Atty. Gen. of Ohio, Columbus, OH, Robert L. Griffin, Asst. Atty. Gen. (briefed), Darlene E.

Chavers (briefed), Columbus, OH, for defendants-appellees.

Before: BROWN and SILER, Circuit Judges, and HOOD, District Judge.[*]

BAILEY BROWN, Circuit Judge.

Plaintiff Rosa Salyer appeals from the district court's award of summary judgment to the Ohio Bureau of Workers' Compensation ("the Bureau") and its administrator in an action for alleged violations of the minimum wage and overtime requirements of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201–19 (1994) ("FLSA"). Salyer serves as a "caregiver" for her disabled husband and, pursuant to the Ohio workers' compensation system, she receives $24 a day from the state for her efforts. Salyer contends that the Bureau, which administers the system, is her "employer" and she is its "employee" under the FLSA. Thus, Salyer argues, the FLSA's minimum wage and overtime requirements apply to her case, and the Bureau should pay for alleged violations of those requirements. The Bureau denies employing Salyer and contends, in the alternative, that Salyer's efforts fall within the FLSA's exemption for "companionship services," 29 U.S.C. § 213(a)(15). Because we agree with the Bureau's latter contention, we AFFIRM.

## I. BACKGROUND

Salyer's husband suffered a serious back injury while operating heavy machinery on a construction job in 1969, and he received permanent and total disability status from the State of Ohio in 1974. Ms. Salyer, meanwhile, voluntarily quit her job to care for her husband, and has not worked outside the home since. She testified that she (1) helps her husband dress, including putting on his back brace and support hose; (2) gives him his medication; (3) helps him bathe and shower; (4) assists him in getting around their home; and (5) cleans his bedclothes when he loses control of his bowels. Ms. Salyer testified that she spends nine to ten hours per day completing all of her tasks for her husband's care, but she described her efforts as "a 24–hour–a–day job." She also testified that she received no training in the performance of her tasks.

Salyer receives payment for her efforts pursuant to Ohio's workers' compensation law. The Ohio Legislature has created an insurance fund to compensate workers who receive injuries on the job. Ohio Rev.Code Ann. § 4123.31 (Baldwin 1995). The Bureau is a state agency that was created to administer this compensation program. *Id.* § 4121.121 (Baldwin Supp.1996). The Bureau's administrator has the power, *inter alia*, to review and process claims applications, and to award compensation and make payment on proper claims. *Id.* § 4121.39 (Baldwin 1995). Moreover, the administrator is authorized (1) to pay amounts from the fund for any medical, nursing, and hospital services which he deems appropriate, and (2) to adopt rules regarding such services. *Id.* § 4123.66(A) (Baldwin 1995).

The specific rules governing the state's payment for nursing services are set forth at section 4123–7–25 of the Ohio Administrative Code. These rules provide for situations like the instant case, in which medical services by a registered nurse or a licensed practical nurse are not needed. In such cases, the injured worker's physician must request non-licensed "caregiver" services, which may be rendered either by a home health agency nurse's aide or attendant, or by a caregiver spouse like the plaintiff. Ohio Admin. Code § 4123–7–25(F) (1994). The treating physician must also develop a treatment plan which indicates what services should be provided. *Id.* The Bureau then determines whether the requested services are both medically necessary and related to the condition for which the injured worker's claim was allowed, and it does so by having a nurse and a doctor review the claimant's file.

Caregiver services which the Ohio regulations deem appropriate include assistance with bathing or eating, placing on a bedpan, assistance with dressing or moving, other

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

assistance with personal hygiene, and the care and supervision of a mentally incompetent claimant. *Id.* The regulations specifically forbid payment, however, for household, personal, or other duties, such as maintaining the house, washing clothes, preparing meals, or running errands. *Id.*

The Bureau's Medical Management Cost Containment Division determines what fees to pay all people who provide needed services to claimants, including nonlicensed spousal caregivers like Ms. Salyer. *Id.* § 4123-7-25(F)(5). The payment rate is not negotiated, and it is a flat per diem amount. According to the testimony of Yvette Shively, a Senior Policy Analyst with the Bureau, caregivers bill the Bureau every two weeks for their services, and the Bureau pays for any special medical equipment needed for the injured worker, as long as it is related to the worker's allowed condition. For example, in the instant case, the state has purchased a hospital bed and a portable toilet for Mr. Salyer's use.

Testimony below revealed that the Bureau typically authorizes home caregiver services such as the services Salyer provides her husband for one year at a time. At the end of the year, the claimant's treating physician must again request the services. If the physician requests no changes in service, then the Bureau generally authorizes the request for another year. If a change is requested, however, the Bureau may, in its discretion, order an in-home evaluation by a registered nurse. In any event, the Bureau may annually conduct an in-home evaluation of home spousal caregivers.

The Bureau keeps records of caregivers like Ms. Salyer only in the claim files of injured workers. Further, the Bureau does not deduct state or federal income or unemployment taxes from the paychecks of caregivers like Ms. Salyer, and the Bureau asks that such caregivers sign a form indicating that they understand this situation.

While the Bureau maintains that it cannot hire or fire caregivers, it can decide—even contrary to a treating physician's recommen-

dation—that a caregiver's services are no longer (1) medically necessary, or (2) related to the condition for which the injured worker has a legitimate claim. Thus, the Bureau can stop paying a caregiver, though it cannot make the caregiver stop performing services.

## II. ANALYSIS

■ We review a grant of summary judgment *de novo,* applying the same test the district court used. *E.g., City Management Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 250 (6th Cir.1994). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Congress designed the FLSA "to be 'a broadly remedial and humanitarian statute.'" *Fegley v. Higgins,* 19 F.3d 1126, 1132 (6th Cir.) (quoting *Dunlop v. Carriage Carpet Co.,* 548 F.2d 139, 143 (6th Cir.1977)), *cert. denied,* — U.S. ——, 115 S.Ct. 203, 130 L.Ed.2d 134 (1994). To that end, this court construes the FLSA's definitions broadly, so as to give effect to Congress's intentions and policies. *Id.* Exemptions from the FLSA's minimum wage and overtime coverage,[1] on the other hand, are to be narrowly construed against employers. *E.g., A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945).

The FLSA defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). An "employee" is "any individual employed by an employer." *Id.* § 203(e)(1). An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). Finally, the FLSA specifically applies to employees "employed in domestic service in a household." *Id.* § 206(f). This court has previously noted the extraordinary breadth of the FLSA's definitions. *E.g., Fegley,* 19 F.3d at 1132 n. 5.

Despite the wide swath these definitions cut, the FLSA does not apply to everyone who has a job. Congress expressly excludes

---

**1.** *See* 29 U.S.C. § 206 (mandating payment of minimum wage); *id.* § 207(a) (mandating payment of overtime).

from FLSA coverage "any employee employed in domestic service employment to provide **companionship services** for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15) (emphasis added).

The parties devoted the majority of their appellate briefs and oral arguments to the close question of whether the Bureau "employs" Ms. Salyer. *See, e.g., Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1467–70 (9th Cir.1983) (holding that public social service agencies were "employers" of in-home chore workers who served disabled public assistance recipients). The district court, after a careful consideration of the facts and background set forth above, held that the Bureau did not employ Ms. Salyer. We need not review that holding, however, because (as the district court noted) even if the Bureau does "employ" Ms. Salyer for purposes of the FLSA, Ms. Salyer's claim still fails if what she provides her husband are "companionship services."

In addition to the statutory definition noted above, the Secretary of Labor has further defined "companionship services" as follows:

[T]he term *companionship services* shall mean those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: *Provided, however,* That such work is incidental, *i.e.,* does not exceed 20 percent of the total weekly hours worked. The term "companionship services" does not include services relating to the care and protection of the aged or infirm which require and are performed by trained per-

sonnel, such as a registered or practical nurse.

29 C.F.R. § 552.6 (1995).

 Assuming, without deciding, that the Bureau does "employ" Ms. Salyer, we agree with the district court's holding that Ms. Salyer performs "companionship services" under both the statutory and regulatory definitions of that term. Thus, her services are excluded from the minimum wage and overtime requirements of the FLSA as a matter of law.[2]

Ms. Salyer's own testimony was that she helps her husband dress, gives him his medication, helps him bathe, assists him in getting around their home, and cleans his bedclothes when he loses control of his bowels. These sorts of services fall squarely within the plain language of the statutory definition of "companionship services," *i.e.,* services "for individuals who (because of age or infirmity) are unable to care for themselves."

Moreover, Ms. Salyer's services also meet the regulatory definition of "companionship services," because they "provide fellowship, care, and protection" for Mr. Salyer, who, "because of ... physical ... infirmity, cannot care for his own needs." Because those services "may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services," we find the regulation to be directly on point. Furthermore, we cannot say that this regulatory definition of "companionship services" is either "arbitrary, capricious, or manifestly contrary to the statute" that it elucidates. Thus, we must give it "controlling weight." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

The handful of cases that have considered the "companionship services" exemption bolster this conclusion. In a recent case, *Cox v. Acme Health Services, Inc.,* 55 F.3d 1304 (7th Cir.1995), the court considered whether a home health aide, who was employed by a private agency, provided companionship ser-

2. Moreover, Ms. Salyer does not meet either of the exceptions (the "trained services" exception or the "general household" exception) which the above regulation outlines. She testified that she has received no training, and the record indicates that the vast majority of the housework she does is related to caring for her husband.

vices. Such aides performed more extensive services than those which Ms. Salyer provides for her husband. *Id.* at 1306. Furthermore, under the applicable state law in *Cox,* the aide's services required more training than do the services listed in the federal regulation. *Id.* Nonetheless, the aide's medical training was far less than that required of registered or practical nurses. *Id.* at 1309–10. The court thus held that the home health aide fell under the exemption. *Id.* at 1311. *See also Linn v. Developmental Servs.,* 891 F.Supp. 574, 576–78 (N.D.Okla. 1995) (holding that a plaintiff who provided similar services, which also required limited training and state certification, "was employed to provide fellowship and protection for individuals of advanced age and physical and mental infirmities"); *Sandt v. Holden,* 698 F.Supp. 64, 67–68 (M.D.Pa.1988) (holding that plaintiff, who provided similar services which were arguably "attendant care services" under state law, fell within the exemption).

The *Cox* court relied, in part, on *McCune v. Oregon Senior Services Division,* 894 F.2d 1107, 1110 (9th Cir.1990), *aff'g* 643 F.Supp. 1444 (D.Or.1986), a case quite similar to the instant case. The plaintiffs in *McCune* were "full-time, live-in attendants for elderly and infirm individuals unable to care for themselves." *Id.* at 1108. The State of Oregon provided the plaintiffs' services to "allow[ ] the recipients to stay at home and avoid institutionalization" and to save the state the high cost of such institutionalization. 643 F.Supp. at 1446. In holding that the companionship services exemption applied to the plaintiffs, the Ninth Circuit noted that:

> these critical services reach more elderly or infirm individuals than they otherwise would precisely because the care-providers are exempt from the FLSA. We also note that many private individuals, who do not benefit from federal and state assistance, may also be forced to forego the option of receiving these services in their homes if the cost of the services increases. The only alternative for these individuals may be institutionalization.

894 F.2d at 1110. The instant case is analogous to *McCune* in that (1) Ms. Salyer lives

with the object of her care, and she testified that she provides that care virtually around the clock; and (2) Ohio's provision of spousal caregiver services, like Oregon's system, enables recipients like Mr. Salyer (and the cost-paying state) to avoid institutionalization. Thus, the same rationale exists here for applying the exemption. *See also Lott v. Rigby,* 746 F.Supp. 1084, 1087 (N.D.Ga.1990) (noting, after reviewing a Labor Department administrative opinion, that "Congress created the 'companionship services' exemption to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them.").

Finally, we look to this court's own precedent in *Toth v. Green River Regional Mental Health/Mental Retardation Board, Inc.,* 753 F.Supp. 216 (W.D.Ky.1989), *aff'd sub nom. Hengesback v. Green River Regional Mental Health/Mental Retardation Board, Inc.,* 985 F.2d 560 (6th Cir.1993) (table). The plaintiffs in *Toth* were "Alternative Living Unit ... providers," working in "a program designed to keep mentally retarded adults out of institutions and to integrate them into local communities." 753 F.Supp. at 216. In that program, which the defendant entity administered, the plaintiffs cooked and maintained homes for their clients. *Id.* The district court held that the plaintiffs, who had only minimal training and whose work largely "related to the care of the client[s]," (1) fell within the companionship services exemption, and (2) could not establish facts sufficient to meet either the "general household" or "trained personnel" exceptions. *Id.* at 217–18.

Ms. Salyer's argument against the application of the companionship services exemption to her is that the Bureau does not employ caregivers like herself in "domestic service employment," as the statutory exemption requires. Rather, she contends, the Bureau "hires" spousal caregivers to address medical needs, not for "domestic services." She also notes that the Bureau's own regulations indicate that it does not pay for "household work related to the individual," which the federal regulation expressly contemplates as a component of companionship services. *See* Ohio

Admin. Code § 4123–7–25(F) (denying compensation for household duties).

We reject these arguments for two reasons. First, we find persuasive the rationale of the court in *Lott,* 746 F.Supp. at 1087–88, which drew on the exemption's legislative history to hold that "domestic service employment" simply means being "employed in a private home." Because Ms. Salyer renders her services to Mr. Salyer almost entirely within their home, she is undoubtedly engaged in domestic service employment to provide companionship services to her disabled husband. *Cf. Linn,* 891 F.Supp. at 578–79 (holding that a plaintiff analogous to Ms. Salyer who did not work in private homes did not fall within the companionship services exemption). Moreover, as heretofore indicated, the companionship services exemption exists to increase the availability of such services which, in turn, address medical needs. Ms. Salyer's argument thus works against her position that the companionship services exemption from the FLSA does not apply to her.

Second, the state regulation is irrelevant because (1) the federal regulation is directly on point, and (2) the things which the Bureau will pay for under its regulation are largely, we believe, also companionship services under the federal regulation. *Compare* 29 C.F.R. § 552.6 (1995) (listing, as companionship services, meal preparation, bed making, washing of clothes, and similar services, along with household work related to the care of the individual) *with* Ohio Admin. Code § 4123–7–25(F) (1994) (allowing compensation for assistance with bathing or eating, placing on a bedpan, assistance with dressing or moving, and assistance with personal hygiene, but refusing compensation for general household work). Ohio indeed may not pay for every service that is contemplated by the federal regulation that exempts companionship services from the FLSA; nevertheless, the services for which Ohio will pay remain subject to federal regulation exemption in the context of minimum wage and overtime laws. *See Sandt,* 698 F.Supp. at 68 (rejecting an analogous plaintiff's reliance on provisions of Pennsylvania's Attendant Care Services Act where the FLSA and its com-

panionship services exemption applied to the case).

## III. CONCLUSION

Because the services which Ms. Salyer provides for her husband fall squarely within the "companionship services" exemption from the FLSA, we AFFIRM.