Melanie NELLIS; Ronald Ford, Plaintiffs,

v.

## G.R. HERBERGER REVOCABLE TRUST, Defendant.

No. CV–03–0709–PHX–NVW.

United States District Court, D. Arizona.

Feb. 22, 2005.

Charles Anthony Shaw, Law Offices of Charles Anthony Shaw, Prescott, AZ, for Plaintiffs.

John J. Balitis, Jr., Julia Sibert Acken, Fennemore Craig PC, Phoenix, AZ, for Defendant.

## ORDER

WAKE, District Judge.

The parties' cross-motions for summary judgment pose the question whether Plaintiff Melanie Nellis, a licensed practical nurse, is entitled to overtime pay under § 207(a)(1), 29 U.S.C. § 207(a)(1), of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), for caring for Katherine Herberger, a beneficiary of Defendant G.R. Herberger Revocable Trust. There is no genuine dispute as to the

material facts so the case turns on the meaning of the "companionship services" exemption from the FLSA, 29 U.S.C. § 213(a)(15) and 29 C.F.R. § 552.6, and of the "trained personnel" exception from that exemption, also found in the latter regulation. Nellis's services come within the regulation's broadly defined companionship services exemption from the FLSA's entitlement to overtime pay; but her services also satisfy the regulation's trained personnel exception, thus taking her out of the exemption and back into the protection of the FLSA.

## I. Background

### A. Facts

Melanie Nellis has been a licensed practical nurse in Arizona since 1984. Between 1993 and 2003 she worked for the Herberger family on several assignments. The Trust employed Nellis to care for Katherine Herberger, an elderly and infirm woman, between April 2000 and February 2003. She usually worked three to five consecutive twenty-four hour shifts during the week. When Nellis was not on duty, Monika Bowman, a certified nursing assistant and a certified medical assistant, cared for Mrs. Herberger. In November 2002 the Trust hired a professional nursing agency to assist Nellis and Bowman in caring for Mrs. Herberger. The parties agree that at least some of Nellis' duties involved "providing companionship and general care to Ms. Herberger." Nellis testifies by affidavit that she also performed the following tasks on a weekly basis:

(1) formulating daily nursing diagnosis and problem areas regarding care;

(2) contributing to the assessment of the health status of Mrs. Herberger;

(3) establishing goals and nursing intervention in the care of Mrs. Herberger regarding strategy of care;

(4) accepting medication and treatment orders for Mrs. Herberger from a physician;

(5) administering medication to Mrs. Herberger requiring refilling medications and monitoring glucose levels;

(6) administering balanced and nutritious meals to conform to the necessities of Mrs. Herberger's diabetic condition and based upon licensed practical nursing judgment.

### B. Statutes and Regulation

The FLSA requires employers to pay covered employees one and one-half times their regular wage for all hours worked in excess of forty hours per work.[1] 29 U.S.C. § 207. In 1974 Congress extended the FLSA to any "employee in domestic service." 29 U.S.C. § 207(*l*). The overtime requirement does not apply, however, to:

... any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide *companionship services* for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)

29 U.S.C. § 213(a)(15) (emphasis added). Pursuant to the explicit administrative delegation in the statute, the Secretary of Labor has defined "companionship services" as:

... those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for

---

1. The Complaint also alleged a claim for treble damages pursuant to Ariz.Rev.Stat. § 23– 355 for wages wrongfully withheld. Nellis's Response withdrew the claim.

his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: Provided, however, That such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked . . .

29 C.F.R. § 552.6. The "companionship services" language of the statute is thus expanded by the regulation to "fellowship, care, and protection." Nellis's job duties fall within that expanded definition, thereby initially disqualifying her from overtime pay entitlement under the FLSA. Nellis argues that she comes within the "trained personnel" exception to the companionship services exemption set out in the latter half of the regulation:

> The term "companionship services" does not include services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse. While such trained personnel do not qualify as companions, this fact does not remove them from the category of covered domestic service employees when employed in or about a private household.

*Id.*

The last sentence of the regulation states what would be the case in its absence, that the exception of trained personnel from the companionship services exemption leaves such persons still in "the category of covered domestic service employees when employed in or about a private home" and thus entitled to the protection of the FLSA. *Id.*

■ The Trust bears the burden of proving that Nellis is exempt from the protections of the FLSA. *See Cox v. Acme Health Servs., Inc.,* 55 F.3d 1304, 1308 (7th Cir.1995). Exemptions from the FLSA's wage and overtime requirements are narrowly construed because the FLSA is a remedial statute. *See A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945).

## II. Legislative History and Meaning of the Companionship Services Exemption and the Trained Personnel Exception

Though Congress in 1974 extended the FLSA's minimum wage and overtime compensation to domestic service employees, 29 U.S.C. § 207, it excluded babysitters and "elder sitters." While the statutory language is "companionship services" rather than "elder sitters," the legislative history makes clear that Congress intended to exempt those who "sat for" elderly and infirm persons. One Senator noted that mandatory overtime pay would be problematic for "people who might have an aged father, an aged mother, an infirm father, an infirm mother, and a neighbor comes in and sits with them. This of course entails some work . . . [but] this would be incidental to the main purpose of the employment." 19 Cong. Rec. 24,801 (1973) (statement of Sen. Burdick). The Chairman of the Subcommittee that wrote the bill, Senator Williams, explained the meaning of the term companionship:

> We use the situation in which people are in a household not to do household work but are there, first, as babysitters. I think we all have . . . in mind of what a babysitter is there for—to watch the youngsters. "Companion," as we mean it, is in the same role—to be there to watch an older person, . . .

*Id.* Senator Burdick then stated, "In other words, an elder sitter." Senator Williams responded, "Exactly." *Id.*

In a later notice of proposed rulemaking the Secretary of Labor noted that Senator

Williams also "described companions as 'elder sitters' whose main purpose of employment is to watch over an elderly or infirm person in the same manner that a babysitter watches over children." Application of the Fair Labor Standards Act to Domestic Service, 66 Fed. Reg. 5481–2 (proposed January 19, 2001). The Secretary observed that the amendments "were intended ... to exempt from coverage babysitters and companions who were not regular bread-winners or responsible for their families' support." *Id.*

■ Though Congress had elder sitters in mind, it did not define companionship services in the statute. Rather, it gave broad discretion to the Secretary of Labor to define the phrase by regulation. 29 U.S.C. § 213(a)(15) ("as such terms are defined and delimited by regulations of the Secretary"). The Secretary promulgated a regulation defining companionship service by inclusion and by exclusion. The regulation broadly defines companionship services as "those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs." 29 C.F.R. § 552.6. Plainly this definition encompasses much more than elder sitting, but the regulation is a valid exercise of the Secretary's authority provided in § 213(a)(15). *McCune v. Or. Sen. Servs. Div.*, 894 F.2d 1107, 1110 (9th Cir.1990). Some of the breadth of this definition is taken back by the exclusion of trained personnel from the companionship services exemption.

The regulation's phrase "trained personnel, such as a registered or practical nurse" could be read either as introducing an example of trained personnel or as defining registered or licensed practical nurse training as a minimum qualification. The Ninth Circuit and other courts have read these words as meaning that no one with training less than registered or prac-

tical nurses satisfies the exception. One set of cases comes close to this conclusion by holding that people who lack any formal training cannot come within the exception. *Salyer v. Ohio Bureau of Workers' Comp.*, 83 F.3d 784, 787 n. 2 (6th Cir.), *cert. denied*, 519 U.S. 964, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996) (finding stay-at-home wife who cared for her husband did not meet the trained personnel exception); *Sandt v. Holden*, 698 F.Supp. 64, 67 (M.D.Pa.1988) (finding plaintiff is outside the exception where she did not have a nursing license of any sort and did not provide nursing services). Other cases reach this conclusion, holding that formal training less than registered or practical nurse training falls short of the exception. *Cox*, 55 F.3d at 1309–10 (home health aide is not trained personnel because he has less training than a licensed or practical nurse); *McCune*, 894 F.2d at 1110–11 (certified nursing assistants "unlike registered nurses and licensed practical nurses, receive only sixty hours of formal medical training" and "did not fit within the trained personnel exemption"); *Armani v. Maxim Healthcare Servs., Inc.*, 53 F.Supp.2d 1120, 1126 (D.Colo.1999) (certified nursing assistant is outside the exception because the requirements for licensed or practical nurses "are far more stringent"); *Terwilliger v. Home of Hope, Inc.*, 21 F.Supp.2d 1294, 1303 (N.D.Okla.1998) (finding that Habilitation Training Specialists did not have "training comparable in scope and duration to that of a registered or practical nurse").

In *McCune* the Court held on-the-job experience allegedly equivalent to formal training to be insufficient, noting that such considerations would create "an administrative nightmare for the state." *Id.* at 1111. Thus, the regulation sets registered or licensed practical nurse training as the minimum standard for the trained person-

nel exception.[2] Nellis meets this minimum standard because she is licensed as a practical nurse.

■ While Nellis has sufficient training, licensing alone does not entitle her to mandatory overtime pay. Nellis must perform services "which require ... trained personnel ..." 29 C.F.R. § 552.6. The court in *McCune* addressed facts opposite to those of this case and found nursing assistants ineligible for the trained personnel exception when performing services for which state law requires a nurse's license. *Id.* The district court there observed that if the plaintiff was prohibited by state law from performing the tasks, then "it would be improper for me to reward him for doing so ..." *Id.* The fair import of *McCune* and of the text of the regulation is that where the worker has the license and the work requires the license, the trained personnel exception is satisfied. The question then is whether Arizona law requires practical nurse licensing for the services Nellis provided for Mrs. Herberger.

### III. Arizona Law Requires Licensing as a Practical Nurse for Nellis's Work

#### A. Arizona law regulating licensed practical nurses and lesser licensees

Nellis contends that her work for Mrs. Herberger required licensed practical nurse training because under Arizona law some of her work may not be legally performed by lesser licensees such as nursing or medical assistants. She relies upon Ariz.Rev.Stat. § 32–1666(A)(1), which provides:

A. It is unlawful for a person who is not licensed or certified under this chapter to: 1. Practice or offer to practice professional or practical nursing in this state.

Unlicensed practice of practical nursing is a class six felony. Ariz.Rev.Stat. § 1667(2). These statutes prohibit persons not licensed as practical nurses from practical nursing and necessarily require such licensing to render practical nursing services.

Practical nursing is defined as "the performance for compensation of services that require knowledge, skills, and abilities that are acquired by completing an approved practical nursing program." Ariz.Rev. Stat. § 32–1601(10). The statute further defines the "practice of practical nursing" as

participating with registered nurses in the assessment, planning, implementation and evaluation of nursing care by:

(a) Providing for the emotional and physical comfort of patients.

(b) Observing, recording and reporting the condition of the patient.

(c) Performing nursing procedures recognized by the board.

(d) Assisting with the rehabilitation of patients according to the patient's care plan.

(e) Assisting with maintenance of health.

Ariz.Rev.Stat. § 32–1601(12). The Rules of the State Board of Nursing elaborate

---

**2.** The case interpretation of the regulation as setting registered or licensed nurse training as the minimum for the trained personnel exception prompted the Secretary in 2001 to propose changes. 66 Fed. Reg. 5481 (January 19, 2001). The proposed regulation would have redefined the trained personnel exception as including any "personnel with training in medical procedures." *Id.* The proposed rule was withdrawn over concerns about the potential economic impact of the expansion of overtime pay entitlement. Application of the Fair Labor Standards Act to Domestic Service, 67 Fed. Reg. 16668–1 (Apr. 8, 2002).

the statute. The rule entitled "Scope of Practice for a Practical Nurse" provides that a licensed practical nurse "shall provide nursing care only under the supervision of a professional nurse or licensed physician." Ariz. Admin. Code R4–19–401. The rule further states:

> The scope of practice for a licensed nurse shall include planning, implementation, documentation, and evaluation of the following:
>
> (1) Providing for the emotional and physical comfort of patients;
>
> (2) Observing, recording, and reporting the condition of the patients including signs and symptoms which may be indicative of change in the patient's condition to the nurse's immediate supervision;
>
> (3) Performing those nursing activities for which the licensed practical nurse has been prepared through basic education and those additional skills which are obtained through approved continued education program;
>
> (4) Assisting with the rehabilitation of patients in accordance with the patient's care plan.

*Id.*

These definitions are wanting in specificity and to some extent circular. Some further meaning can be drawn from the tasks permitted under the lesser licenses of nursing and medical assistants. Such tasks alone, even if permissible for licensed practical nurses, ought not to meet the trained personnel requirements for registered or licensed practical nurses.[3] A nursing assistant is certified to "provide or assist in the delivery of nursing or nursing-related services under the supervision and direction of a licensed nursing staff member in a location where a nursing assistant is required by law to be certified." Ariz.Rev.Stat. § 32–1601(8). The rules promulgated for nursing assistants explicitly provide that a "nursing assistant may perform the following" tasks:

> (2) Tasks learned through inservice or educational training if the task meets the following criteria and the nursing assistant has demonstrated competence:
>
> (a) The task can be safely performed according to clear, exact, and unchanging directions;
>
> (b) The task poses minimal risk for the client and the consequences of performing the task improperly are not life-threatening;
>
> (c) The results of the task are reasonably predictable; and
>
> (d) Assessment, interpretation, or decision-making is not required during the performance or at the completion of the task.

Ariz. Admin. Code R4–19–813(A)(2). Nursing assistants "may not perform any task requiring judgment based on nursing knowledge, such as the administration of medications." Ariz. Admin. Code R4–19–813(B).

While these regulations also want for specificity, there are differences between what nursing assistants and licensed practical nurses may do. Licensed practical nurses may perform tasks that involve evaluation while nursing assistants may not. Licensed practical nurses' scope of practice "shall include planning, implementation, documentation, and evaluation . . ." Ariz. Admin. Code R4–19–401(B). Licensed practical nurses also may observe the patient and report changes or problems to a supervisor, which may involve making judgments about the patient's

---

**3.** Unlicensed persons may perform tasks under a physician's delegation, direction, and supervision, such as administration of medications. Ariz.Rev.Stat. § 32–1421(A)(6); Ariz. Op. Atty. Gen. No. 85–042 at 1. Thus, mere administration of medications, under authority of Ariz. Rev. st. § 32–1421(A)(6), even by a licensed practical nurse, is insufficient to meet the trained personnel exception.

health. Ariz. Admin. Code R4–19–401(B)(2). In contrast, nursing assistants are prohibited from performing tasks that involve "[a]ssessment, interpretation, or decision-making." Ariz. Admin. Code R4–19–813(2)(d). Nursing assistants are authorized to perform routine, low risk tasks that do not involve evaluation. Ariz. Admin. Code R4–19–813(2). Thus Arizona law authorizes licensed practical nurses, but not nursing assistants, to perform evaluative tasks.

Arizona also licenses and regulates medical assistants. A medical assistant "assists in a medical practice under the supervision of a doctor of medicine, physician assistant, or nurse practitioner" but "does not diagnosis, interpret, design, or modify established treatment programs or perform any functions that would violate any statute applicable to the practice of medicine." Ariz.Rev.Stat. § 32–1401(16). Most tasks medical assistants are authorized to perform require the "direct supervision" of a physician, physician assistant, or nurse practitioner. *See* Ariz.Rev.Stat. § 32–1456(A); Ariz. Admin. Code R4–16–303(A)–(B). "Direct supervision" means that "a physician, physician assistant . . . or nurse practitioner . . . is within the same room or office suite as the medical assistant in order to available for consultation regarding those tasks that medical assistant performs . . ." Ariz.Rev.Stat. § 32–1401(8). A medical assistant may perform defined clerical tasks without direct supervision. Ariz.Rev.Stat. § 32–1456(C). Like nursing assistants, medical assistants are not permitted to perform tasks that require them to "diagnosis, interpret, design, or modify established treatment programs." Ariz.Rev.Stat. § 32–1401(16).

## B. Application to the tasks Nellis performed

■ Nellis performed tasks requiring assessment and evaluation for which Arizona law requires licensed practical nurse training at a minimum and that Arizona law does not allow medical or nursing assistants to perform. Nellis's affidavit states that she "formulated daily nursing diagnosis," "contributed to the assessment of the health status of Ms. Herberger," and "established goals and nursing intervention" strategies. Nellis' deposition is more specific about her workday. Nellis testified that she "constantly assessed" Mrs. Herberger's condition. She evaluated Mrs. Herberger's bowel sounds, lung sounds, and the sounds of other organs to determine if her condition was changing in a manner that necessitated medical attention. She inspected Mrs. Herberger's skin to see if she had any tears or other problems due to her skin ailments. Nellis monitored Mrs. Herberger's fatigue, activity levels, and mental status, and planned the patient's schedule accordingly.

Nellis' job required assessing Mrs. Herberger's physical and mental conditions and evaluating changes in her conditions. Nellis did not perform only routine tasks like dispensing medication and keeping Mrs. Herberger company. The nature of her tasks would change depending on Mrs. Herberger's condition, and the results of the tasks were not "reasonably predictable." *See* Ariz. Admin. Code R4–19–813(A)(2) (allowing nursing assistants to perform tasks according to "unchanging direction" that are "reasonably predictable"). These are tasks that licensed practical nurses must perform because they involve assessment and evaluation.

The Trust does not dispute that Nellis performed the specific tasks to which she testified, but it argues that the tasks did not require "nursing skill" or "nursing judgment." When asked in her deposition whether it was her "allegation in the lawsuit that there were certain tasks performed for Mrs. Herberger that only a

licensed nurse could perform," Nellis responded, no. Nellis' response is insufficient to create a genuine issue of fact in this case. Her response must first be considered in the context of the exchange, which when read in whole appears repetitious and likely to have caused Nellis to be confused. Second, her answer is technically correct because higher licensees, such as registered nurses and physicians, could also perform the tasks. Finally, the question itself does not mirror the legal test applicable to the trained personnel exception. The issue is not whether the tasks required practical nurse training as a practical matter, as the question implies, but whether state law requires someone with licensed practical nursing training to perform the tasks. Thus, Nellis one-word response to this question fails to create a genuine question of material fact as to the nature of the tasks she performed.

The Trust also cites the following testimony of Dr. McCauley in support of their argument that the tasks Nellis performed did not require nursing judgment:

Q: Did you need somebody exercising nursing judgment in the Herberger home, given the fact that you were exercising the ultimate judgment on how to treat the various conditions that were communicated to you?

A: I did not.

The Trust offers this testimony as evidence that Nellis did not exercise nursing judgment on the job, but Dr. McCauley does not specifically deny this fact. Rather, he testified that he did not need someone to exercise nursing judgment to fulfill his obligations toward Mrs. Herberger. Dr. McCauley's needs do not refute what Nellis actually did in the home. Dr. McCauley's further testimony that he exercised ultimate judgment over Mrs. Herberger's condition is not inconsistent with Nellis' allegations. Nellis still could have performed tasks that required her judg-

ment even if the final decisions were left to Dr. McCauley. Thus, the doctor's testimony does not contradict Nellis' testimony about the types of task she performed in the home.

Finally, the Trust argues that expert testimony, not just Nellis's description of her tasks, is necessary to make a *prima facie* case that licensed practical nurse training was required for Nellis's work, that Nellis's expert witness did not express such an opinion, and that Nellis herself is barred from expressing such an opinion because she was not disclosed as an expert. Whether Arizona law requires the training of a licensed practical nurse (or of a higher medical licensee) for the tasks Nellis performed and does not allow those tasks to lesser medical licensees is a point of law. Nellis's expert witness Ilene Borze fairly did express that opinion. She said, "Nellis's training and experience, as a Licensed Practical Nurse were instrumental in the proper care of Mrs. Herberger." The Trust's expert witness Mary H. Griffith agreed that this conclusion "has an element of truth," though she further concluded that the records of Nellis' work do not show that Nellis "evaluated her care to Mrs. Herberger" and that the family and others considered Nellis's work to be the same as Monica Bowman's. Griffith's opinion about what the records show and what the family and others thought does not contract Borze's opinion or Nellis's factual testimony about what she actually did.

Thus, on the facts of record, Nellis performed some tasks that required licensed practical nurse training under Arizona law.

## C. Arizona Law Requires Licensing of Registered Nurses and Licensed Practical Nurses Employed in Private Homes

The Trust argues that the Arizona statutes requiring licensing as a practical

nurse (and as a registered nurse) do not apply at all in private home employment. This is the actual import of any opinion in the expert affidavit of Mary Griffith, formerly of the Arizona Board of Nursing, that Nellis's services did not require licensing as practical nurse. She observes that Ariz.Rev.Stat. § 36–402(8) exempts from regulation by the Arizona Department of Health Services "places that do not purport to be establishments that regularly provide health related services and at which one or two persons receive health related service on a twenty-four hour basis." Since the Herberger home meets this description of places not regulated by the Department of Health Services, Ms. Griffith opines that anyone lawfully may render registered nurse and licensed practical nurse services in the Herberger private home without licensing. She says, "[I]t stands to reason that persons working in that home were also not subject to DHS regulations."

Under the Trust's view, nursing services in private homes in Arizona are in a regulatory state of nature. The Trust further acknowledged at oral argument that under its view of Arizona law no registered nurse or licensed practical nurse working in a private home in Arizona would ever qualify for the trained personnel exception of 29 C.F.R. 552.6 or for the protection of the FLSA. This is faulty reasoning from the wrong starting point.

■ First, Ms. Griffith's opinion affidavit in this respect will be excluded because she offers an interpretation of Arizona law, which is not a proper subject of expert testimony. *See McHugh v. United Service Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999) (noting that expert testimony "cannot be used to provide legal meaning or interpret ... policies ..."); *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir.1996) (stating that the role of experts is to analyze factual evidence and not to

testify about the law); *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir.1992) (stating that matters of law are "inappropriate subjects for expert testimony"). The Trust responds that Ms. Griffith is merely testifying to the obvious meaning of the statutes and not supplying her own interpretation. But that concedes rather than refutes that she is offering a legal opinion. Her use of the phrase "it stands to reason" shows as much. Whether her inference stands to reason will turn on the strength of the inference itself.

Second, even read in isolation, the health care institution statutes support no inference that nurse licensing applies only in health care institutions licensed by the Department of Health Services. By its plain terms Ariz.Rev.Stat. § 36–402 only excludes private homes and other non-enumerated kinds of facility from licensure and regulation as health care institutions. The statute limits its scope to "this chapter," and the nurse licensing regime is not in the same chapter or even the same title of the Arizona Revised Statutes.

Third, the nurse licensing statutes themselves are comprehensive in their scope and give no sanctuary for undocumented nurses working in private homes. Section § 32–1666, Ariz.Rev.Stat., which makes it a crime to practice nursing without a license, gives no exceptions for place. Such a strange and dangerous purpose should not be attributed to the legislature without the clearest statutory language, and here the statutory language forecloses that meaning.

■ Ms. Griffith and the Trust also argue that Nellis could not have been performing the work of a licensed practical nurse because licensed practical nurses must work under the supervision of a physician or registered nurse or else face "a charge of unprofessional conduct." Super-

vision is defined as "the direction or periodic consultation provided to an individual to whom a nursing task or patient care activity is delegated." Ariz. Admin. Code R4–19–101. Nellis periodically consulted with Ms. Herbergers' physicians and therefore was supervised. The supervising physician or registered nurse need not be present at the home.

### D. The performance of exempt and nonexempt tasks

■ Not all of the tasks Nellis performed were required to be done by a licensed practical nurse. For example, Nellis prepared meals that conformed to Mrs. Herberger's diet, helped her eat her meals, and gave her medication. Nellis, however, is not disqualified from the trained personnel exception simply because she performed some tasks that do not require her training and licensing. It is well settled under the FLSA that "the performance of any substantial amount of nonexempt work in any workweek defeats an otherwise applicable exemption." *Wirtz v. Carstedt,* 362 F.2d 67, 69–70 (9th Cir.1966). In this case "nonexempt work" is trained personnel work, for which a licensed practical nurse's training is required. Exempt work is companionship services ineligible for the trained personnel exception. If Nellis performed any substantial amount of work that required licensed practical nurse training, then she is excepted from the companionship services exemption and entitled to overtime pay under the FLSA.

At oral argument the Trust's counsel acknowledged that "some" of Nellis' duties required licensed practical nurse training. (Tr. at 27:16–18; *see also* 27:25 & 28:1–6.) Even apart from that acknowledgment, the record conclusively shows that Nellis provided a substantial amount of services that required licensed practical nurse training, including assessment and evaluation of Mrs. Herberger's condition. The fact that some of Nellis's tasks did and some did not require her training leaves her within the trained personnel exception and within the protection of the FLSA.

Close analysis of the federal and Arizona statutes and regulations finds Nellis protected by the FLSA and its overtime pay entitlement.

### IV. Liquidated Damages

■ Plaintiffs move for liquidated, or double, damages pursuant to 29 U.S.C. § 216(b), which provides:

> Any employer who violates the provisions of section 206 or section 207 of this Title shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages.

Section 216 requires the court to award liquidated damages against employers who have violated the FLSA, but the mandate is modified by § 260:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] . . . the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this Title.

29 U.S.C. § 260. Section 260 grants the court discretion not to award double damages if the employer proves both that it acted in good faith and that it had reasonable grounds to believe it was in compliance with the FLSA. To avoid summary judgment on the liquidated damages issue the employer must present evidence that establishes a triable issue of fact on both the good faith and the reasonable grounds requirements. If the employer fails to

demonstrate a triable issue of fact, then the court lacks discretion and must award double damages pursuant to § 216. *See Equal Employment Opportunity Comm'n v. First Citizens Bank,* 758 F.2d 397, 403 (9th Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228 (1985). The employer's burden to show that "despite the failure to pay appropriate wages, [it] acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing ..." it was in compliance with the FLSA is a heavy one, with liquidated damages being the norm and single damages the exception. *Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 142 (2d Cir. 1999).

The Trust asserts that it had reasonable grounds to believe its conduct complied with the FLSA because it did not know Nellis was a licensed practical nurse, and that is a disputed fact on this record. However, the court need not determine whether there is a triable issue of fact on the Trust's reasonable ground to believe it was in compliance with federal law because there is no triable issue of fact on the requirement of demonstrating good faith. *See* 29 U.S.C. § 260.

 The statutory good faith requirement is a subjective and necessarily factual inquiry. To create a triable issue the Trust must present evidence that it had "an honest intention to ascertain what [the FLSA] requires and to act in accordance with it." *Bratt v. County of Los Angeles,* 912 F.2d 1066, 1072 (9th Cir. 1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 785, 112 L.Ed.2d 848 (1991) (quoting *Brock v. Shirk,* 833 F.2d 1326, 1330 (9th Cir. 1987)); *First Citizens,* 758 F.2d at 403. The law imposes a duty on employers to take "affirmative 'steps'" and "actively endeavor[ ] to ensure compliance" with the FLSA. *Alvarez v. IBP, Inc.,* 339 F.3d 894, 910 (9th Cir.2003), *cert. granted on different issue,* 2005 WL 405752 (2005); *see also*

*Herman,* 172 F.3d at 142; *Bankston v. Illinois,* 60 F.3d 1249, 1255 (7th Cir.1995); *Williams v. Tri–County Growers, Inc.,* 747 F.2d 121, 129 (3d Cir.1984). If the employer fails to show good faith, an award of liquidated damages is mandatory, even if the court finds that the employer did not act willfully. *Cox v. Brookshire Grocery Co.,* 919 F.2d 354, 357 (9th Cir.1990).

In *Alvarez* the court held that the employer's "ex post explanations" for why it did not take affirmative steps to ensure compliance were insufficient to demonstrate good faith. *Alvarez,* 339 F.3d at 910; *see also First Citizens,* 758 F.2d at 403 (holding that the employer's "bald assertions that the officers thought that they were in compliance with the Act" did not satisfy the good faith requirement). In *Bratt,* by contrast, the employer had a qualified person conduct an objective study to determine which employees were exempt from the FLSA. 912 F.2d at 1072. While the employer could have taken additional steps to determine eligibility, the employer's efforts demonstrated an honest intent to comply with federal law. *Id.*

 In this case, the Trust has submitted no evidence of any efforts to ascertain the requirements of the FLSA. Gary Herberger testified that he never considered whether Nellis might be eligible for overtime and never did anything to determine her eligibility because Nellis never raised the issue. Such explanations do not excuse the Trust from its affirmative duty to ascertain what the FLSA requires of it as an employer. *See Alvarez,* 339 F.3d at 910. This is true even absent a showing of bad faith. *See Brookshire,* 919 F.2d · at 357. Having failed to produce evidence of an honest intention to comply with the FLSA, the Trust fails to establish a triable issue of fact as to liquidated damages. The court therefore lacks discretion pursu-

ant to § 260 and must award liquidated damages under § 216.

While the award of liquidated damages may seem harsh in the absence of subjective bad faith, such damages "[are] not a penalty but rather [are] available in order to provide full compensatory relief for losses that are 'too obscure and difficult of proof for estimate other than by liquidated damages.'" *Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684, 687 (7th Cir.1982) (quoting *Overnight Motor Transp. Company v. Missel*, 316 U.S. 572, 583–84, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942)); *see also Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Congress provided for liquidated damages because it recognized that those protected by federal wage and hour laws would have the most difficulty maintaining a minimum standard of living without receiving minimum and overtime wages and thus "that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well-being." *Brooklyn Sav.*, 324 U.S. at 707, 65 S.Ct. 895. The Trust's lack of subjective bad faith in dealing with Nellis is not sufficient to meet the statutory requirement of good faith efforts to comply with the FLSA so as to avoid liability for liquidated or double damages.

## V. Conclusion

The undisputed evidence and acknowledgments of the parties bring Nellis's work for Mrs. Herberger within the protection of the Fair Labor Standards Act and its entitlement to overtime pay. A substantial portion of her work required her training as a licensed practical nurse, which is sufficient to bring her within the trained personnel exception to the companionship services exemption of 29 C.F.R. 552.6 from the Fair Labor Standards Act.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 25) is denied.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. # 43) for liability for overtime compensation pursuant to 29 U.S.C. § 207(a)(1) is granted as to single and double damages pursuant to 29 U.S.C. § 216(b) with the amount of such damages to be determined in further proceedings.